No. 88-21

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

IN RE THE CUSTODY OF PIERRE DANIEL
ANDRE, a minor child.

PATRICK G. ANDRE,

Petitioner and Respondent,

-vs-

CAROL DOBSON, a/k/a ANN McALLISTER,

Respondent and Appellant.

APPEAL FROM: District Court of the Fourth Judicial District,
In and for the County of Missoula,
The Honorable Douglas Harkin, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Klaus D. Sitte, Montana Legal Services, Missoula,
Montana

For Respondent:

Thomas W. Trigg, Missoula, Montana

Submitted on Briefs: July 14, 1988

Decided: September 16, 1988

Filed: SEP 1 6 1988

*Ethel M. Harrison*

Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Carol Dobson, the natural mother, appeals from the findings of fact, conclusions of law and order of the District Court of the Fourth Judicial District, Missoula County, which granted custody of the minor child to Patrick Andre, the natural father. We reverse.

Although the parties vigorously contest the factual basis of the District Court's opinion, we conclude that the dispositive issue is one of first impression: namely, what is the appropriate burden of proof justifying a change of physical custody when the child has been living with a parent pursuant to a custody agreement which has not been scrutinized by a court?

Carol Dobson (Mother) and Patrick Andre (Father) met during the summer of 1977 while both parties were residing in Arizona. The parties soon began living together but never married. Their son was born in August 1978.

Pierre is Father's only child. Mother has two other children from an earlier marriage. Mother had custody of the two children following her divorce but admitted she was not a good mother. The children were subsequently placed in foster care by the Arizona Child Protective Services based on reports of neglect. The children were later returned to Mother during her relationship with Father but she was unable to control the children. They were eventually placed with mother's ex-brother-in-law voluntarily.

For most of Pierre's first four years, Mother and Father lived together and shared parental responsibility. During a portion of this time, Father was the primary caretaker while Mother supported the family through employment as

2

an exotic dancer. Mother later resumed the role of primary caretaker when Father obtained employment on a seismograph crew.

In 1982, the parties separated permanently. At that time, Mother and Father agreed that Mother would retain custody of Pierre while Father returned to school and "got his life together." Father was to pay an undetermined amount of child support and would be allowed to see Pierre when he wanted to. The agreement was oral and not presented for judicial approval.

From 1982 until 1984, Father's contact with, and support of, Pierre was irregular. Beginning in the fall of 1984, Father took a more active role in his son's life. Visitation increased significantly but was still not regular. According to Father, Mother's interference and constant moves were partially responsible for the irregularity. Father continued to pay minimal child support.

Upon separation, Mother became acquainted with Gary Mitchell as a result of four-year-old Pierre's wandering away and appearing at Mr. Mitchell's door. Mr. Mitchell and Mother later began living together and eventually married. At one point in the relationship, Mother left Mr. Mitchell and later moved in with Roger Garman but continued to see Mr. Mitchell. While Mother was living alone, Pierre would usually sleep in the front room when Mother had male guests spend the night.

Father began the instant action in 1985 as a result of perceived problems with Pierre. Father was disturbed by Pierre's alleged lack of personal hygiene, inadequate dress, lack of responsibility, failure to obey his parents, lying, stealing, pants wetting, and failure to do well at school. Father and his wife attempted to resolve the problems through constructive, consistent discipline and by enrolling Pierre

3

at a private school at their expense. They have largely remedied the problems.

Mother, on the other hand, is alleged to be unwilling or unable to resolve Pierre's difficulties. An impartial child psychologist retained by both parents determined that Mother's lack of parenting skills and the instability in her life had had a negative impact on Pierre. Although Pierre was having problems in school, Mother did not consistently help with his homework on the days Pierre was with her because of her lack of time and her problems understanding the work.

Her response to other problems has also been less than adequate. When Pierre took twenty dollars from her purse and bought himself a watch, Mother allowed him to keep the watch as a birthday present. She explained that he may have thought the money was his because it came from his father. Incidents of stealing gum were dealt with by having Pierre return the gum or by Mother keeping it. Pierre is also allowed to be aggressive. He refers to his mother as Carol and issues commands to her during play. Similarly, Mother did not interfere in a fight she observed because Pierre was sticking up for a friend and allows Pierre to be rough with animals.

The psychologist concluded that Mother's constant changes of residence and attempts to change Pierre's name had led to so much instability and confusion in Pierre's life that he was not sure what his name was. In addition, Mother's smoking of marijuana in front of Pierre had not provided a good role model. The psychologist therefore recommended that Father be granted custody with reasonable visitation by Mother. The District Court agreed.

The dispositive issue in the instant case is the District Court's use of the best interests test, as delineated

4

in § 40-4-212, MCA, to deprive Mother of custody. Mother argues that her de facto custody of the child since birth imposes a higher burden upon a parent seeking to deprive the custodial parent of custody. We agree.

Although Montana has not addressed the issue of de facto or de jure custody arrangements, the issue has been examined by our sister state of California. In Burchard v. Garay (Cal. 1986), 724 P.2d 486, the court was confronted with the question of the applicable standard of proof, justifying a change of custody in a situation in which the mother had maintained a de jure custody since the child's birth two and one-half years earlier. Before reaching the merits, the court first examined the nature of the changed circumstances rule urged by the mother and the best interests test urged by the father. It reasoned:

> The changed-circumstance rule is not a different test, devised to supplant the statutory test, but an adjunct to the best-interest test. It provides, in essence, that once it has been established that a particular custodial arrangement is in the best interests of the child, the court need not reexamine that question. Instead, it should preserve the established mode of custody unless some significant change in circumstances indicates that a different arrangement would be in the child's best interest. The rule thus fosters the dual goals of judicial economy and protecting stable custody arrangements. (Citations omitted.)

724 P.2d at 488.

Inexplainably, the California majority went on to hold that the changed circumstances rule did not apply because there had not been a prior judicial determination, a decision which, on its face, conflicts with the stated goal of fostering stability in a child's life.

5

Stability of custody arrangements, whether created judicially, by agreement, or by default, is one of the most crucial factors in a child's development. Recognizing this fact, "the Uniform Marriage and Divorce Act in effect creates a presumption that the best interests of the child are served by continuation of initial custodial arrangements and allows this presumption to be overcome only in the most limited circumstances." Sharp, Modification of Agreement-Based Custody Decrees: Unitary or Dual Standard?, 68 Va.L.Rev. 1263, 1267-1268 (1982). See generally, §§ 40-4-212(4) and 40-4-219, MCA. We see no reason why this presumption should be ignored in de facto or de jure custody arrangements. As noted by Justice Mosk in his concurring opinion:

> First, the limited application of the changed-circumstance rule that the majority adopt is in conflict with the primary purpose of this rule. The child whose custody was established by means other than judicial decree has the same need for and right to stability and continuity--and accordingly the same entitlement to the protection the rule is intended to provide--as the child whose custody was established by judicial decree. Because it is not unreasonable to assume that the children of two-parent and relatively more affluent families are disproportionately represented in the class of children whose custody was originally established by judicial decree, the majority's holding, I fear, will effectively deny needed protection disproportionately to children of single-parent and less affluent families.
>
> Second, most states--including, until today, California--appear to require "changed circumstances" to modify custody regardless of how custody was originally established. [Citation omitted.] The rationale for this position was

6

> explained in <u>Carney</u>: "regardless of how
> custody was originally decided upon,
> after the child has lived in one par-
> ent's home for a significant period it
> surely remains 'undesirable' to uproot
> him from his 'established mode of liv-
> ing,' and a substantial change in his
> circumstances should ordinarily be
> required to justify that result."
> [Citation omitted.]

<u>Burchard</u>, 724 P.2d at 497.

Although the end of a relationship is a time of great trauma, parents generally love their children and have the greatest interest in determining which of them can best care and provide for the child. Black v. Black (Cal. 1906), 86 P. 505, 506. In addition, parents are in a much better position to determine custody arrangements. Hassell v. Means (N.C. App. 1979), 257 S.E.2d 123, 127. It would be unrealistic to assume that the welfare of a child can better be determined by a court after a short period of self-interested testimony. We therefore conclude that the changed circumstances rule and best interests test, as set forth in § 40-4-219, MCA, is applicable when a parent seeks modification of a <u>de facto</u> custody arrangement.

However, the primacy of the child's, not the parents', interests requires additional recognition and protection. Occasionally, in rare situations, it may appear that while circumstances have remained unchanged, custody was clearly inadequate since its inception. In such situations, strict application of the change of circumstances rule would work as a serious injustice to the child and contravene the benefits of the flexibility inherent in the interaction of the changed circumstances-best interests standard. As stated in Svennungsen v. Svennungsen (1974), 165 Mont. 161, 167, 527 P.2d 640, 643:

7

> We do not want to be understood as implying that a substantial change in circumstances would be required as a threshold finding in every factual situation before the issue of custody could be litigated on a petition to modify custody . . . [W]e would be receptive to the proposition that a showing of unfitness on the part of the person having custody, or some other justifiable grounds might suffice and, despite a failure to show a substantial change of circumstance, enable the district court to consider the issue of custody on a petition to modify custody.

See also, Burchard, 724 P.2d at 499 (Mosk, J., concurring). We offer no opinion on whether this exception is applicable in the instant case.

The judgment of the District Court is reversed and remanded for a determination of whether a change of circumstances has occurred or the above-stated exception applies. The court is also instructed to cause separate counsel to be appointed to represent the interests of Pierre. Costs to Mother.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_William E. Hurth_

_____

Justices

Mr. Justice Fred J. Weber dissenting.

I express reservation about this holding because I do not feel that the facts of this case justify what I consider to be a change in our custody statutes. I do not dispute the importance of recognizing the length of time a parent serves as the primary caretaker of a child whose custody has not yet been determined under our statutory scheme. However, this Court should not override the extensive findings and judgment of the District Court in this case based on the requirement of finding a change in circumstances. Unlike the majority, I do not feel that the District Court ignored the fact of mother's primary caretaker role. Counsel for the mother repeatedly stressed the 9 years in which the child had been in her care, with increased involvement by the father through visitation beginning when the child was 6 years old and continuing to the present. The District Court made extensive findings regarding the competence of both parents, which adequately justify his decision to award custody to the father even in light of the mother's role as primary caretaker. I would defer to the judgment of the District Court in this matter and affirm this decision. Even under the majority's holding I find substantial evidence in the record to justify the District Court's determination. I respectfully dissent.

_____
Justice

Mr. Justice L. C. Gulbrandson joins in the foregoing dissent.

_____
Justice

10